Thank you, Madam Clerk. Please be seated. Good morning. My name is Morgan Christen. Welcome to the Ninth Circuit Court of Appeals. I'm one of the circuit court judges. My chambers are in Anchorage, Alaska. So this time of year, I'm particularly happy to be here in Pasadena today. I'm sitting with my colleague from Honolulu, Judge Clifton, and my colleague from Portland, Idaho, Judge Tallman. We're going to hear four cases on the calendar today, and we have not submitted any of them. The first is case number 23-4201, Peter Ingilis v. Kathy Ingilis v. Monsanto. Counsel, if you could come right on up. It will just take me a minute to rustle these papers and get situated. If you can give me that time, it would be appreciated. Okay. It looks like we're all set. Good morning, Your Honors. It may please the Court. I'm Thomas Burns, and I represent Mr. and Mrs. Ingilis. I'd like to reserve three minutes for rebuttal, please. Sure. The district court included Dr. Schneider's differential ideology as unreliable on two grounds. First, it resolved genuine dispute of predicate fact against the opinion when it held Mr. Ingilis was obese at all relevant times. And second, it rejected as unscientific Dr. Schneider's interpretation of medical literature on obesity and his reliance on his own clinical experience, extensive clinical experience, to rule it out. Both rulings were either legal errors to which no deference is owed, serious abuses of discretion, or misdescriptions of the record. Counsel, as I understood Judge Chabria's concern, there was a question as to whether or not your expert had actually reviewed any medical records that referenced a high BMI, had never met your plaintiff, didn't even know what he looked like. And so he was essentially confronted at the hearing with the reliability of his opinion. But then he changed his position during his testimony at the hearing, saying, well, obesity doesn't matter. And the district court, on that basis, determined his opinion was unreliable. So is that clear error? Is that the position that you're taking? Do we have to overturn that? You do, and I think the reason is the district court didn't understand properly the two stages of the differential ideology. So the ruling in stage, you cast a very wide net and you rule in various things. I think that's what his expert report did because it says- Where does his expert report rule in obesity as a potential positive factor? So he says, per the plaintiff's fact sheet, he's negative for these conditions, therefore I rule them out. What is the plaintiff's fact sheet? Great question. I was confused as well. Well, there's an argument over perhaps the trend in his weight, although I've got some real concerns about that. But at the time he winds up appearing, I assume his lawyer saw him at some point, even if Dr. Schneider didn't. He's 5'6 and over 200 pounds, so he is wide in some fashion. So how is it that the fact that he might be a little heavy doesn't get communicated to the expert who lists obesity explicitly in his report as a negative condition? So the fact sheet, to answer the first part of the question, if you look at MDL DOC 1883.1, that's the template for the fact sheet. And that's something in MDLs that's often worked out between the plaintiff's and defendant's counsel, and it lists a number of conditions- Who fills that out? Obesity. That's filled out. The record doesn't say in this case, but what I understand to be the truth is that it was filled out with the plaintiff's attorney's office. That's what I inferred. So somebody had dealings with him and knew that he was at least wide. How is that that's not communicated to Dr. Schneider? So the fact sheet says it's not obese. Again, this is sort of not in the record. It says negative for obesity. Negative for obesity. And number one, the plaintiff says, I've never been diagnosed as obese, which I think the medical records bear out that he's never actually been diagnosed as obese. That doesn't change whether or not he was obese. That's another fact issue we can, we will talk about. Either he's big or he's not. And the fact that nobody had put in the record the word obese doesn't tell me he wasn't. The reason that he's that it doesn't say positive for obese is he doesn't actually look obese. Like, you know, the experts not seen a picture of him. I have a medical obesity, anything over a BMI of twenty five. There's controversy about that. The that is one way about whether the BMI is an accurate rendition of obesity. But isn't it true in the medical literature that if a patient has a BMI of twenty five or more, he is medically obese? Whether or not it's a reliable indicator or not, isn't that true? It's that's how a lot of papers approach it. There's controversy about whether that is accurate, like you said, because really it's supposed to be measuring or estimating adiposity. But Mr. Gillis had a BMI in the 30s at several points in his life, didn't he? At two points. And so wasn't that information provided to the doctor, to the expert? He had medical records in front of him. It's not clear to me and I've not I just haven't been able to figure out a clear answer whether he had those specific medical records in front of him. I just don't know. He said he examined his medical file. He did, but the reliance list, there are two things that possibly could show that he had those medical records. One is he says medical records of F. Marie, Dr. F. Marie. And that might be a typo because the doctor's name is sorry, M. Frank. The doctor's name is Frank Marie. He might have that's possible that that's a typo. And then it says something about Advent Health. That's apparently where this primary care physician works. So I don't know if he's seen these specific records. I guess the concern I'm having here is that the district court cited this as the basis for the factual determination that he had ruled out obesity without even having any basis to do so. And I'm trying to figure out how that's a clear error on the part of the district court who listened to the testimony in the cross-examination of the expert at the hearing. Well, I don't think at the Daubert stage that the judge is not supposed to resolve disputes of predicate fact. But he has to. There has to be determination that the expert has a reliable basis on which. And that was the finding, that it wasn't reliable. And he wasn't adhering to the particular methodology that he purported to be using. Right. So why is that wrong? Why was the district court wrong? On that point, which is just one of the two arguments, obviously. I understand. But we're giving you a lot of questions. So I just want what's your best shot at this? My best shot is that there is an evidentiary basis for his conclusion based on the fact sheet and based on the definition. If the definition isn't right, how is that an evidentiary basis? Because it's sworn. It's a sworn document. The conclusion that Mr. Angelos was not obese. Is that the conclusion you mean? Yes. The fact sheet says I'm not obese. Right. And the deposition, he's asked, have you ever been diagnosed as obese? No. And then he gives what his current weight is under oath. And he says what my weight used to be in 1990. Okay. So back up. And you were trying to answer the question, what's your best shot? My best shot is the arithmetic that I tried to explain in the brief. Yep. Saying it's going up slowly, gradually. If his BMI reached 30, it wouldn't have happened until just a couple of years before the diagnosis. And because these are slow-moving, indolent diseases, that's not long enough for the obesity to have made a difference. But you have the earlier measurement of BMI that was high. And so how is it a scientific or reliable approach for the doctor to disregard that? And you're trying to say throw it to the jury, but we can't do that because we have to determine if the approach taken by the proposed expert is reliable. And so far, we haven't heard anything other than reliance upon the fact sheet that he was given, for which he's not responsible. It's not his fault. But if he's told information that turns out not to be correct and proceeds based on that, how can we conclude the report in the end is reliable? My argument is that that is a dispute of predicate fact that's not supposed to be resolved by the report. Stop, stop, stop, stop, stop. Because we have to decide if the report is reliable. So the fact that the doctor may not have been well-informed, but the jury finally decides, well, he maybe wasn't obese after all, doesn't change the fact that he had reports or should have had reports that at the earlier measurement he had a BMI over 30. He simply treated that as negative based on the fact sheet, and the fact sheet doesn't necessarily reflect actual conditions or what was recorded in the medical record. That's a problem. I understand your concern. Why don't I move on to the second issue about if it was something that he had, and you resolve that predicate fact in his favor, is his opinion that BMI doesn't matter reliable? And so this is where, Judge Tolman, you were talking about the pivot. You used two pronouns. Do you mean if Mr. Ingalls was obese, Dr. Schneider's opinion wouldn't matter to Dr. Schneider's opinion? Because that's the other part of the problem, right? Yes, and I only need to win one of these two arguments to get a reversal here. It's your best shot on the second one. So my best shot on the second one is he initially ruled it in because the fact sheet says this is something you're supposed to consider, and he addresses it by saying, oh, he's not obese. That's separate. And then he's presented at the Daubert hearing for the first time with this article about obesity, because he's not asked about that at deposition. That's not part of the initial Daubert motion. And that night before, he looks into it. Now, he's not doing what Monsanto says, which is just like digging into his opinion. He's like, well, I've never thought that obesity really matters, but now I'm presented with an article. Let me look at this article and see if I got it wrong. Because, you know, he has a vested interest in his own reputation, right? So he looks at the article, and he says, number one, I think the article is flawed because it's conflating the difference between chronic lymphocytic leukemia and small lymphoma CLL and SLL. And it turns out that those are the same two diseases. The only difference is CLL is in the blood and SLL is in the lymph node. So this is the night before article that's described in the briefing in the Google search, right? And your client, I mean, sorry, your expert has reason to take issue with it. Yes. So number one, he disputes the article. He's like, I'm not persuaded by your article. And then he does additional research, and he finds these other studies that, sorry, this other study in oncology that has a table. And his understanding as a 35-year board-certified oncologist is, like, there's no accepted connection between obesity and CLL. And even Monsanto's article says that. Like, it says that, you know, the studies are inconsistent, the effects of it are modest. And the study that Monsanto has, the data size is fleetingly small. Like, they're talking about 25 patients that have a period that they're looking at with CLL. And Dr. Schneider has seen 1,000 patients. Like, his data set is 40 times bigger than the Monsanto study. Not only what he says, I've seen fat people and I've seen skinny people, without any numbers, without any context that lets us know that that was a scientific approach. He's seen lots of people over the years. How is that necessarily reliable? Given that his report listed obesity, it's not like it's out of the blue, completely unrelated. Now, it may have been because it was on the standard fact sheet. But his report identified obesity as a factor to be considered. He simply said this client is not obese. If that turns out to be wrong, we're now to Part 2. But his consideration appeared to be limited to the Google search the night before and this long clinical experience with no detail. How is that scientific? It is scientific because it's based on his clinical experience, and that's a very important consideration that this course has said in Messick, Wendell, and Hardiman. But saying, I've been a long-time physician is not a get-out-of-jail-free card. He doesn't tell us anything about it except I've seen fat people, I've seen skinny people. And he's not really given an opportunity to tell everybody about it because he's like, I want to talk about this study. Can I talk about this? Can I talk about how BMI works? And each time the questions pivot away from that or the judge pivots away from that. But his counsels or the counsel that retained him has an opportunity to ask questions too. The opportunity is there to detail, but in his report he didn't talk about this because he said he wasn't obese. And at testimony, it wasn't surprising that opposing counsel didn't make it easy, but plaintiff's counsel had a chance to ask questions, and we still didn't find out what it was other than this year's clinical experience. And the 1,000 patients with CLL that he saw. Judge Christin, I don't know how your clock works. It's working fine. You wanted to reserve two minutes and you don't have two minutes left, so if you want to stop there when you come back. So, sir, what I tried to tell you is that if you want to stop there, we'll put two minutes on the clock when you come back because we took up an awful lot of your time with our questions. I'm delighted to answer all the questions. You want to save two minutes. Good morning, Your Honors. Nicole Anton on behalf of Monsanto. I heard two points from my opposing counsel, and first was that this is a genuine dispute of relevant fact and that's why you should reverse Judge Ciapria's opinion. That is not the case. This isn't about what the facts actually show. This is about how Dr. Schneider handled those facts. Whether he adhered to the methodology that he chose to use, right? Precisely, Your Honor. And that seems to be the problem. That's, I think, why Judge Ciapria thought that the opinion was not reliable. And so that is an entirely reasonable basis, and it's certainly not a manifest discretion of error. Second, when he then realized, when Dr. Schneider realized that there was a problem with the factual basis and that he hadn't canvassed the actual record or spoken to the patient or seen a picture of the patient, he then changed his rationale for why he said obesity wasn't pertinent here. He switched to saying, actually, even though I previously ruled out obesity, what I actually think is that it's not a risk factor at all. But he wasn't qualified. But the risk, it was a risk factor, right? He should have ruled it in and then ruled it out. And so there's a question about whether he recognized it as a risk factor in this case. The record and the transcripts are a little difficult. I think opposing counsel has a valid point about that. But I do think there was a shift between the experts first saying, this person isn't obese, so I don't need to worry about this, and then saying, oh, obesity doesn't matter anyway. Is that a fair summary in your view? We certainly agree with that, Your Honor. One of the primary issues with Dr. Schneider's analysis was that switch. An expert is supposed to review the literature, use their clinical experience, look at the medical records, and then reach a conclusion. What Dr. Schneider did here was he reached a conclusion, and then when there was questions about that conclusion, he completely changed his basis for saying that conclusion is correct. That's not permissible under Daubert. Is your position then that had Dr. Schneider discussed obesity in his report and stated his belief that obesity doesn't really matter because BMI is not an accurate factor in causation of this particular form of cancer, that would have cured the problem that brings us here today? Without seeing the actual analysis, I can't say for sure, but I can certainly say that that would get much closer. While we might have questions about how that ruling out process was done in that report, that at least would show evidence that he had considered it in an analytically rigorous method. We don't have anything close to that here. Let me come at the question in a slightly different way. Yes, Your Honor. You don't have any disagreement over the fact that he applied a differential diagnosis, which basically requires the doctor to rule in all of the different factors that might cause the cancer and then to rule out in some reasoned way all of the factors that he or she can, leaving us with whatever is left in the bucket, which then has to be discussed as a causation factor of the cancer. Is that a correct assessment of how the methodology is supposed to work? Yes, Your Honor. In order to do a differential etiology, so to determine the causation, the expert is first supposed to look at potential causes, rule them in just as you said, and then look at those and rule them out either on a basis that they don't exist here, for example, there's an identified risk factor but that person doesn't have it, or that they're not capable of doing so, although that second part can also be considered part of the ruling in analysis as well. So to get back to the question I originally asked you, had the doctor identified the high BMIs in the medical records and made a determination that for purposes of his analysis the patient would be considered obese and then gone on to explain why he didn't think obesity was a contributing factor here, his opinion would be admissible. Is that right? So I would certainly think that had the doctor actually considered it and identified the correct medical facts with respect to Mr. Angelis, that would come a much longer way towards having an admissible opinion. So you're not going to quite give me a yes, but that's kind of a yes. The issue here is the second part, his ruling out of obesity as a potential cause at all. But wouldn't he be permitted to do that had he properly identified it as a factor by relying in part on his training and experience in 35 years of oncology and internal medicine and rendering an opinion that he didn't think obesity was a contributing factor? We believe that no, he couldn't do that here, and the reason is I agree he certainly has 35 years of experience as a treating oncologist. But he was asked, in your clinical practice, you do not typically evaluate the cause of an individual person's lymphoma, right? He said typically no. He also said that that's because as a treating oncologist, if you have cancer, it doesn't really matter how you got it. I've got to get you better. And so he certainly has a lot of clinical experience, but it's not the relevant clinical experience for this question, which is the causation of non-Hodgkin's lymphoma, not whether a person has it. Didn't the district court restrict his testimony so that he could not testify as to specific causation? Do you mean? Well, the district court excluded his general causation analysis as well and excluded his specific causation. But even before the hearing, though, I thought he was being offered. I guess he is the only expert that the plaintiff had on specific causation. That's correct, Your Honor. And so, but we would say that his analysis for specific causation here required him to do a general consideration of whether obesity is capable of causing it and that he doesn't have the clinical experience to do that here. The opposing counsel's contention, I think, is that he wasn't allowed to back up and say that this really shouldn't have been ruled in to begin with because a fair review of the literature wouldn't show that obesity is correlated. We would say that's not sufficient for two reasons. One, that's not what Dr. Schneider originally did, and so the fact that it's a post hoc justification alone renders it unreliable. But two, we think there is good reason for ruling in obesity here. First, his report acknowledged it as a potential causal factor. He used the language causal factor. Second, he was presented with literature from defense counsel at the evidentiary hearing, which he conceded reported a statistically significant odds ratio for the development of CLL, another word for non-Hodgkin. Is that the literature that was presented to him the night before? Yes. May I make a note about that, Your Honor? I think that in the briefs it's sort of unclear. The reason he received that literature the night before was because it was provided as part of advanced cross-examination materials. I understood that. And so the purpose. Yes, I understood that. But I think Judge Clifton was trying to ask a question, and we started at the same time. If it is true he has acknowledged that he, in his practice, clinical practice, wasn't focused on the cause, the fact that he had examined so many people, and if he had gone back and said, but based on my observations, I can draw these conclusions which didn't come out in detail. So I'm really focused on what you said a moment ago about the fact that his focus was on treatment, not on determining the cause. I'm not sure that necessarily precludes him from being able to comment upon cause based on what he'd observed. This is sort of theoretical because we don't have that, but that's the qualification I was seeking to ask you to comment upon. Yes, Your Honor. We would say that in a question about causation, he does need more than just having observed patients because observing is quintessential anecdotal evidence, and that's why oftentimes courts, including Judge Chabria, require epidemiological evidence that looks at whether what's observed is actually tied to a phenomenon and whether it can actually be considered to be causal. And so we would say that observations, in particular the way they were justified here, which as Your Honor noted was his explanation that he sees skinny people, and I quote, and fat people, and I quote, doesn't rise to the level that can provide a reliable analysis of causation. Are there any other questions? I do have one other question. It changes topics a little bit, but it's puzzled me. And it's partly perhaps the differential diagnosis, but most things have, or a lot of things, have multiple causes, and the law doesn't require that causation be limited to one and only one factor. And so I'm sitting here wondering, well, obesity has been identified as a factor to consider, but does it mean it's only obesity or obesity combined with other things? And in this case, could the plaintiffs make an argument under, I guess it's Florida law, but I think it's pretty common, that there are multiple causations or conditions that in combination lead to this. And so continue to make an argument that says, but for the exposure to your client's product, he wouldn't have encountered the condition that he encountered. Yes, Your Honor. So the legal standard does allow for multiple contributing causes. However, the issue here isn't that legal standard. The issue is how Dr. Schneider did his analysis. And so he didn't do his analysis and say, I've looked at obesity, I've looked at the literature on obesity, and I've looked at the literature on glyphosate and NHL, and I've found that I can't rule out glyphosate, and I also can't rule out obesity, so maybe they both contributed. What Dr. Schneider did do is say, I've ruled out obesity based on a self-reported plaintiff fact sheet that's contradicted, it turns out, by the medical records, and now actually what I think is that it's not a risk factor at all. So the question of getting to, I can't rule it out, but there's combining causes, isn't one that ever is reached here because we're just looking at how he handled his opinion and the justification he gave for that opinion, and that's not the opinion he gave. Thank you, counsel. Thank you. Since we have a couple minutes, I will pose one additional question, which is I didn't go pawing through the medical records. I don't think I have all of them, but I found it unusual that over many years there are apparently only the two references to BMI, and height doesn't change all that much. I've gotten a little shorter as I've aged, but weight can change a lot, and his testimony is that it did change a lot. Is there really nothing in the records that would permit a determination of what his weight was over a couple of decades? Yes, Your Honor. So there's nothing in the record before this court to be clear beyond those two weights. There were additional weights in his medical records, and they were consistent with the other weights that were put before the district court, so around 200 pounds, including over a period of 15 years. And the other thing that I will note is that the deposition testimony that you heard about is an explanation for Dr. Schneider's opinion that's been given by counsel. Dr. Schneider didn't offer that explanation. In fact, same with the arithmetic that counsel mentioned earlier. These are all lawyer justifications, and what we have to look at is what Dr. Schneider said, and he didn't offer any of those. But to your original question, the medical records do have a significant number of additional weights, and they're consistent with a weight between 195 and 204 pounds. Okay, now I'll let you go. Thank you, Your Honors. Counsel, you have two minutes. I'd like to first address the pivot again, or the supposed pivot, and the ruling in, ruling out stage, both of which you, Judge Tallman, and Judge Christin asked about. So his view on the ruling in, ruling out is, like, I think he did rule it in in the report, but at the Daubert hearing he says, I didn't have to rule it in because I wasn't required to rule it in because I don't think it's a risk factor. But even though I didn't have to, I did, and now I have a good basis to rule it out because this is my understanding of the medical literature. I disagree with Monsanto's study, and in my clinical experience and my reading of the literature, this is not an established, it's a very weak association, if any. And so he has a basis to rule it out. But the district court was concerned by the fact that because of the fact that he didn't think he was obese, that was the basis on which he ruled it out. And when he was confronted with what the record showed during his testimony, that's when he quote, unquote, pivoted and said, well, even if he was obese, it doesn't matter. Right, but in the district court's mind, he thought, you're changing your opinion. You ruled it in, and why are you ruling it out? I think not. I think the district court was worried about the methodology. He was worried about that. That's what he has to be worried about to make this determination. It's not, right? It's not the conclusion. Right. I know you know that, but you do seem to be slipping over into challenging the conclusion and treating this as a finding of facts. So the ruling, this is why I think the district court was wrong on that. The ruling in is cast the wide net, and he did that, and then the ruling out is look at it very closely. And here he initially ruled it out because of his understanding of the weight and the obesity, and then when he's presented with this article the night before, he- He decides it doesn't matter anyway. No, he doesn't. He always knew it didn't matter. It's just that he's like, oh, well, now I'm going to be asked about this more closely. Let me confirm that my understanding of the literature remains correct, and that's when he does his additional research. Do you believe the record counsel is not? Do you think the court was wrong to perceive a pivot? Yes, because his opinion- Okay, you're out of time, so just quickly. Why do you think the district court was wrong to perceive that your expert pivoted? Because he always had the opinion, as he explained, I've always had this opinion. It's just that his- Wait, finish the sentence, please. I've always had this opinion, what? That this person wasn't obese or that obesity doesn't matter. That obesity doesn't matter. Okay. It's that he doesn't state that in the report. That's a problem. Because his understanding of the plaintiff's weight was that he was not obese, and then when he's pressed on it, he answers the question. He's like, well, now you're pushing me on this. Even if he is obese, it doesn't matter to me because this is my understanding of the literature. This is my understanding from my clinical experience, and that should be enough. And then remember, you know, he's considered 20 risk factors. He's ruled all of them out. Really what Daubert and Rule 702 are getting at is preventing the jury from hearing confusing, unreliable testimony, and this is the kind of thing that I think a jury would easily be able to understand. Are you fibbing when you're pivoting, supposedly, from an opinion that you ruled it in to ruled it out, or is this, like I'm saying now, was this always your opinion and you just misunderstood something about the medical records? The question is, was it an abuse of discretion based on the record that was before the district court at the hearing to exclude him from offering a specific causation opinion? Right. And I think, yes, because he's not adequately weighting his clinical experience, which he's required to do under Wendell, Messick, and Hardiman, and he's also disregarding his understanding of the medical literature. So basically the judge is saying, this is how I understand the medical literature. It's widely discussed. It isn't really, and you just, like, you know, you haven't explained to me a basis for doing it. But my reading of the transcript, the Daubert hearing transcript, is he did do that analysis. He did it on the fly the night before, but he didn't invent this. This was what he always thought, and so he's careful. Go ahead. Finish your sentence. Well, you are two minutes over time, so I'm trying to, but please finish your sentence. So this is his understanding of the medical literature, and the judge really doesn't give him, not only doesn't give him the opportunity to really say that at the Daubert hearing, but then gives him short shrift again because, remember, there was a prior Daubert order where he just knocks him out. But he again doesn't, he gives him short shrift in the order saying, like, well, you've not adequately explained your understanding of the literature. I think he did. I think we understand your argument. You're starting to repeat yourself. Yes. We appreciate your advocacy. All right. And both of your arguments, and so we'll take this matter under advisement. Okay. Thank you very much. It's been a pleasure to be here. Thank you.  We'll go on to the next case on the calendar.
judges: TALLMAN, CLIFTON, CHRISTEN